Good afternoon. The next case called for oral argument is People v. Daryl Lane. Council, whenever you're ready, you may proceed. Your Honor's counsel, nearly five years ago, Doris Fisher, Dorothy Bone, and Michael Cooney were brutally murdered in March of 2005. This is nearly five years. On March 4th, the defendant was interviewed about the murders and released. Subsequently, on July 21st, 2006, the defendant was charged with those three murders. Then in 2008, November, he filed a motion to suppress statements he made during the March 4th interview, which the court granted. The court found that the defendant was in custody when he arrived at the St. Louis police station. And the court found that the defendant did not knowingly and intelligently waive his rights. This court should reverse the court below for several reasons, and its review should be de novo on the ultimate question of whether the defendant was in custody and de novo on the ultimate question of whether the defendant knowingly and intelligently waived his rights. This was the main police station downtown, Clark Street? It was a St. Louis police station, and officers from Belleville went to that station to interview the defendant. So the court's order below is manifestly erroneous, as well as erroneous as a matter of law, because the court failed to consider the entire circumstances surrounding the interview and did not just consider the time the defendant was picked up. Now, this is what happened. Well, the test itself is an objective test, a reasonable man test. It doesn't consider, this test does not consider the defendant's mental abilities, his age, his experience, none of it. This is a reasonable man test, which is different than the test that's going to be applied under the Miranda waiver issue, which is issue two. But I want this court to remain focused on the reasonable man test for this particular issue. The only relevant inquiry is after you look at the circumstances, would a reasonable man in the defendant's position or the suspect's position understood that he was free to leave and free to terminate the interview? And that's what we're looking at. As to the conditions, here's what happened. Three officers went in one car to the defendant's residence to pick him up, to ask him to go and participate in an interview about the three murders. The defendant knew that this was what he was going to be asked about because his mother explained to him about the murders and explained that she would like for him to tell the truth. The officers were there for 45 minutes. They went in. He was asleep at the time they arrived. And one officer and the defendant's mother went in to wake him up and he got dressed. They gave him 45 minutes to do so. So they're not rushing him. It's leisurely and kind. So 45 minutes to get dressed. The officers arrived in one car. There were three officers. One of them is going to have to sit in the back seat. So the court put some emphasis on the fact that there was an officer sitting in the back seat with the defendant. But logically, this should have meant nothing to a reasonable person because he had to ride somewhere. They couldn't force three officers into the front seat of a squad car and then he would be sitting in the back by himself. It would not have worked. In other circumstances, the mother had no car and could not drive. So the defendant had to be transported by the officers in that squad car. There was no other option. So a reasonable person in that position also would not have found that coercive or a sign of arrest. There wasn't any testimony that guns were drawn or that he was physically restrained except for the mother who testified that he was handcuffed. But the court apparently did not credit the mother's testimony on this point because the court, in outlining the conditions that it thought were indicative of custody, does not mention that the defendant is handcuffed. And the court had a good reason for not crediting the mother on this point because, first off, she's an interested witness in the first place. And second, her testimony was contradicted on several points. Most notably, though, she denied that she gave permission for the officers to take her son for an interview. And she also denied that she had told him to tell the truth. But when this court looks at the video recording of the March 4th interview, you will see that the defendant himself agrees, yeah, my mama told me about the murders and she told me to tell the truth. And so the mother has no credibility on this issue and apparently the court did not find that he was handcuffed. So at this point we have a defendant who has been awakened, gently permitted 45 minutes to get dressed, and is riding in a squad car with three other officers. Well, you might think three officers, I mean, a reasonable person might wonder why it took three officers to ask him to come down to the office. Who knows? That weighs against him. But then there's the rest of the story. When he's taken to the police station, he's put into an interview room. And when this court looks at the video, you can also see the officers go in and out. It is an open door. It's not locked. So he is in an unlocked room. He's waiting for 15 to 20 minutes. And the tape shows him, I mean, it's a DVD, shows him lying down with his head on the desk. And he's relaxed. He's probably still sleepy from being woken up. I don't know. Anyway, but he's left there alone. He hasn't attended. There's nothing. When the officers come in, they introduce themselves. One is a juvenile officer. And they tell him, and this is part of the Miranda warnings he's going to get, but they really weren't necessary because he wasn't in custody. They tell him, you don't have to talk to us. So that's another circumstance that would make a person in the defendant's position not think that they were in custody. The defendant, as you will see on the video, is sitting closest to the door. And there's a table between him and the two officers. So he is closest to the egress. There's no indication that his egress was blocked in any way. The interview is very short, 25 minutes. And during that interview, you'll see that the officers are extremely kind to the defendant. The court commented on this, that there's nothing. He's not treated as if he's under any suspicion at all. It is just a very bland interview in which he makes false exculpatory statements, which is what the state is interested in having. But he's not threatened. He's treated very kindly. They understand that he's a 16-year-old. They understand that he has limited reading ability. And they treat him very gently and express no suspicion of him. At the end, they ask him to stay a little more. And they say, do you have a problem with that? And he says no. So he agrees to stay on. It's all very, there's no indicia of force or restraint or anything that would normally accompany custody. He wasn't booked or fingerprinted or physically restrained at any time. There's no show of weapons. My memory of reading the briefs was that they went through each of the individual Miranda rights. Yes, they do that. They do that. But I do not believe it was necessary. Let's assume for the sake of argument that he is in custody. Tell us in detail what they did as far as the Miranda rights are concerned. My understanding is that they went through them and they also explained it as they would to a juvenile. Is that correct? They didn't use the standard form. They used a form that was developed by Dr. Cuneo specifically for people about 10 years of cognitive function and with a fourth grade education. And it was, as Dr. Cuneo testified, that this particular warning was designed for a person of limited intelligence just like the defendant in his particular circumstance. It contained one thought per sentence and it was broken down into very simple language. The defendant has a second grade reading level, so he could not read this out loud very well. He stumbled over some words. Go ahead. But anyway, I especially ask this Court to exercise its own discretion to review this video de novo and reverse the Court below. Thank you, Counsel. Counsel? Thank you, Your Honor. May it please the Court. Counsel? Thank you, Your Honor. And I would submit to Your Honors that in this case, the findings of the Court are based on evidence. The opposite findings are not apparent. Let's begin with the question of whether Daryl Lane was in custody at the time of his statement to the police. Now, according to our Supreme Court in People v. Braggs, which was recently cited approvingly by our Supreme Court in a case called People v. Slater, the Court can consider a whole range of facts when determining whether the accused was in custody at the time of the statement. The location of the interrogation, the number of officers, and the age, intelligence, and mental makeup of the accused. And that's right there in Braggs. So the Court was free to consider that when determining whether Daryl Lane was in custody at the time of his interrogation. Now, in this case, the police went to Daryl Lane's house, actually the home of Daryl Lane's mother, and took him from the house to the police station. Now, in the suppression hearing, there was only one witness who testified about what happened at the Lane residence, and that was Daryl Lane's mother, Susan Lane. Now, I would submit that there was nothing in Susan Lane's testimony that was obviously preposterous, so the Court was not in a position just to disregard her testimony. And in fact, at the end of the suppression hearing, the judge explicitly credited Susan Lane's testimony when stating his factual findings. So I would submit that we have to consider Susan Lane's testimony. And what did Susan Lane testify to? Well, she said three police officers showed up at her house, apparently unannounced, and they told her that they wanted to question her son. They did not ask her for permission to question her son. And she and one of the officers awakened him, and the three officers remained in Daryl Lane's bedroom as he dressed. And then they took him out of the house to the squad car, and as he was walking from the house to the squad car, he was in handcuffs. Now, that testimony is uncontradicted. As I say, Susan Lane was the only one who testified about what happened at the house. Now, when he gets to the police station, they put him in this cramped little room, apparently without a window. And the glass on his door is obviously mirrored glass, so he can't even see out of the hallway. Now, the purpose of these Miranda rights, agreeing to Miranda rights, is to help the person, the accused, to overcome the compulsion inherent in a police-dominated atmosphere. When you talk about a police-dominated atmosphere, I mean, it's there in the video. That's a classic police-dominated atmosphere. He's in the cramped little room. The entire time, there are two interrogators with him, except when one of them steps out momentarily. So, there were three officers at the house who carted him away, and two interrogators in the interrogation room for just about the entire interrogation. Now, given all of those facts, I think you have to conclude that there are plenty of facts to support the judge's finding that Daryl Lane was taken into custody before the interrogation began. And you certainly cannot say that an opposite finding is apparent, or that the judge's finding was unreasonable or arbitrary, or not based on evidence. There's plenty of evidence. Moving on to the second part of it, whether Daryl Lane intelligently and knowingly waived his right to remain silent on the other rights before the interrogation. Of course, the judge found that he did not knowingly and intelligently waive his rights. Which is another way of saying that the judge found that the state failed to meet its burden of proving, by repugnance of the evidence, that the waiver was knowing and voluntary and intelligent. The state had the burden of proof at the suppression hearing. Now, Judge Cuneo met Daryl Lane three years and nine months after the interrogation. It was in December of 2008 that Judge Cuneo met him. He interviewed him, he gave him a reading test, and found that he read at the second grade level. Remember, this is three years and nine months after the interrogation. He was reading the second grade level. The Miranda form that he was handed at the interrogation was written at a fourth grade level. So the Miranda form was written at a level two grade levels above the level where he was reading, three years and nine months after the interrogation. Do you contest the state's proposition in its brief that the warnings which Dr. Cuneo had reworded, in effect, were read to the defendant, that they tried to make sure he understood it, and that if he didn't understand certain words, that they were explained? Well, there was quite a bit in what Your Honor just said, so I would have to say yes, I do contest that. Okay, what do you contest? Really, the police officers handed him the Miranda form and told him to read the various items on it. And he stumbled over all these words, including quite ordinary words, short words, words that you would expect a ten-year-old to know and to be able to read. And they did not ask him to explain all of these rights in his own words, the way Dr. Cuneo did three years and nine months later when he interviewed him. They simply asked Darrell Lane whether he understood that right, or understood that right. And he always said yes, and he always initialed next to it. By the way, his initials, you know, Darrell M. Lane, he's D-M-L. He wrote D-L-M, the initial letter D-L-M. I mean, this is a guy who doesn't even know how to write his own initials, for goodness sake. So, yes, I do contest what the state says. I don't think they were nearly as, I don't think the police were nearly as solicitous as the state indicates. So, at any rate, here we have all this evidence that Dr. Cuneo generated. The reading test, the intelligence test, showed a full scale of IQ of 63. The interview, he examined the school records for Darrell Lane. He examined the Miranda form where he messed up the initials and messed up even the giving of the date. And he watched the interrogation video. And after reviewing all this evidence, examining all this evidence, Dr. Cuneo could not even hazard a guess as to whether Darrell Lane understood his rights at the time of the interrogation, three years and nine months earlier. Now, I ask your honors, I don't ask, pardon me, I submit to your honors that if Dr. Cuneo could not even hazard a guess as to whether Darrell Lane understood his rights at the time of the interrogation, we cannot reasonably fault the circuit court for concluding that the state had failed to prove, failed to establish, that Darrell Lane did understand his rights. Well, for all of those other reasons, I ask this court to affirm the order granting the motion to suppress evidence. Are there any questions, your honors? I don't believe there are. Thank you, counsel. Counsel, please. Counsel, what other facts do you contest that was, counsel for the defense gave? Are there any of those facts that he gave about the handcuffs or anything? Do you contest? Oh, yes, yes. And how many people testified at the suppression hearing? What testimony there is we'll be looking at later, but we don't have it now. Yeah. The three officers that picked the defendant up that day did not testify. Okay. The only testimony we have about what was there was, what occurred at the house, is the defendant's mother's testimony. But just because she's the only one that testified doesn't mean the court had to wholesale take her testimony as totally credible. Particularly in places where she was shown to be not credible, where she said, I didn't tell my son to tell the truth. And he, on the video, will say, my mama told me to speak the truth. There, and she was obviously interested, and nobody else mentioned any handcuffs. The defendant was never seen in any handcuffs at the police station. You will see that he is unrestrained. But as far as whether this court is bound by an Illinois Supreme Court case on the standard of review, Miranda is a federal prophylactic rule to protect rights, and the United States Supreme Court sets out the standards for applying that rule. And this court should follow Yarborough v. Alvaredo, which is cited in the People's Brief, which clearly says it is an objective test that does not consider the mental state, age, or experience of the suspect. Now, it's true that Dr. Cuneo would not hazard an opinion on whether the defendant, at 16, in 2005, understood his rights. He would say that in 2008, he could read, if it was read to him, if this simplified same warning that he got was read to him, that he could understand it. Now, you will see on the video that the officers, they say, the defendant says, I don't read very well, but then they want him to read. And he begins to read. When he misses a word, occasionally, not all the time, he reads, you know, he's slow. But he does read some, and he reads some of the difficult words, and he stumbles inexplicably over others. But then they help him with that word, and they go on. And they ask him, do you understand that? And he does indicate some on the video, as Dr. Cuneo testified, and as you will see, he does indicate that he has an understanding of what the role of an attorney is. And he knows he can't afford one, because he says, I don't have money for one. So, there is that. The defendant, in 2005, was 16, he was in ninth grade, he had an individualized education program, and he had been tested, and his IQ, his verbal IQ was 73 in 2005. In 2008, when Dr. Cuneo examined him, it had dropped six points to 67. So he, you know, he had lost some ability, some intelligent quotient between 2005 and 2008. So he was, I mean, Dr. Cuneo, just extrapolating from his report, you could see that the defendant was more, perhaps, intellectually stimulated in 2005 than he was in 2008. But he seems to have a better verbal IQ in 2005, at the time of the interview. And that's important for this court to remember when reviewing this decision. Well, you say a verbal IQ, what was his other IQ? His other IQs? Okay. What was it? It dropped in all areas. His performance IQ in 2005 was 66, his full scale in 2005 was 68. In 2008, it had dropped performance to 64, it dropped two points, and his full scale had dropped to 63 from 2005. Are those within a margin of error, or is there any margin of error in that? I'm sure that the final score, you know, I think you should read the report. Okay, all right. And talking about report, these were a form of questionnaire that Dr. Cuneo had prepared, is that correct? He did testing, some testing, and then the IEP in 2005 was done by the school, but he relied on that report. No, I'm talking about the rights that were explained. Oh, the rights, they were geared to someone of the defendant's intelligence. They were designed for someone of his intelligence with a fourth grade education, but Dr. Cuneo, and this isn't, this is, there's no, the defendant could not read it by himself, but he didn't read it by himself, he was helped. Thank you. Thank you, counsel. We appreciate the briefs and arguments of counsel, and we will take this case under advisement.